## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SUSAN ELAINE BRELAND** | § | **PLAINTIFF** |
| | § | |
| | § | |
| **v.** | § | **Civil No. 1:17cv276-HSO-JCG** |
| | § | |
| | § | |
| **CITY OF WIGGINS, MISSISSIPPI,** | § | |
| ***et al.*** | § | **DEFENDANTS** |

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT ADAM DEDEAUX'S MOTION [18] FOR SUMMARY
JUDGMENT AND QUALIFIED IMMUNITY, AND DENYING AS MOOT
PLAINTIFF SUSAN ELAINE BRELAND'S MOTION [32] TO STRIKE**

BEFORE THE COURT are Defendant Adam Dedeaux's Motion [18] for

Summary Judgment and Qualified Immunity and Plaintiff Susan Elaine Breland's

Motion [32] to Strike Defendant Adam Dedeaux's Affidavit filed in support of his

Motion [18] for Summary Judgment. After due consideration of the record, the

parties' Motions, related pleadings, the record, and relevant legal authority, the

Court is of the opinion that Defendant Adam Dedeaux is entitled to qualified

immunity, that his Motion [18] for Summary Judgment should be granted, and that

Plaintiff's Motion [32] to Strike should be denied as moot. Plaintiff Susan Elaine

Breland's claims against Defendant Adam Dedeaux in his individual capacity will

be dismissed with prejudice.

# I.  BACKGROUND

A.  Factual background

This matter involves an excessive force claim arising out of the arrest and detention of Plaintiff Susan Elaine Breland ("Plaintiff" or "Breland"), following a traffic stop that occurred on October 30, 2014, in the City of Wiggins, Mississippi. Breland claims that, while she was in police custody, Defendant Adam Dedeaux ("Defendant" or "Officer Dedeaux") violated her Fourth Amendment right to be free from the use of excessive force.  Specifically, Breland asserts that "the injurious use of unreasonable, abusive and excessive force" by Officer Dedeaux violated her rights under "the Due Process Clause of the Fourth Amendment to the United States Constitution and/or the Fourteenth Amendment to the United States Constitution . . . ."  Compl. [1] at 9. [1]

1.  Officers stop and detain Breland

In the late-night hours of October 30, 2014, Dustin Parker ("Officer Parker"),

---

[1]  Breland's Memorandum [25] in opposition to Officer Dedeaux's Motion for Summary Judgment only addresses a Fourth Amendment excessive force claim.  *See* Pl.'s Mem. [25] at 4 ("On September 29, 2017, Plaintiff filed this Complaint asserting violations under the Fourth Amendment from excessive use of injurious force against her under 42 U.S.C. § 1983.").  Even if the Fourteenth Amendment were found to apply to Breland's claims, she has not shown that the measures taken by Officer Dedeaux violated her rights under that provision.  "To succeed in a § 1983 action based on 'episodic acts or omissions' in violation of Fourteenth Amendment rights, a pretrial detainee must show subjective deliberate indifference by the defendants."  *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017).  A plaintiff must therefore show that the defendant knew of and disregarded a substantial risk of serious harm.  *Id.* at 419-20.  "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference."  *Id.* at 420.  "To reach the level of deliberate indifference, official conduct must be 'wanton,' which is defined to mean 'reckless.'"  *Id.*  Breland has made no such showing here.

a police officer with the City of Wiggins, was advised of a disturbance and as a result conducted a traffic stop of a vehicle driven by Breland. *See* Parker's Police Report [18-2] at 1. Officer Parker was wearing a body camera, and approximately 30 minutes of video footage from the stop have been filed of record. *See* Ex. "C" to Def.'s Motion [18] (conventionally filed). The video reflects that at the time Officer Parker stopped Breland, she was wearing sunglasses while driving at night, appeared to be inebriated, and was slurring her speech. *See id.* The audio indicates that she also had an open beer can in her car. *Id.*

Breland was wearing a heavy, black leather jacket. *See id.* At one point approximately four minutes into the video, Breland attempts to place her hands in the pockets of her jacket, and Officer Parker instructs her not to do so. *See id.* Breland responds "[t]hey ain't nothing in them," and starts waving her hands around in the air. *See id.* Officer Parker orders Breland not to make any "fast motion" at him, or he will perceive it as a "threat." *Id.*; *see also* Parker's Report [18-2] at 1 ("I asked Breland not to put her hands back in her jacket pocket and she made a fast punching motion toward me. I advised her not to do that to a [sic] I take that as a threat.").

Officer Parker is then joined by two fellow Wiggins police officers, one of whom is Officer Dedeaux. During her encounter with the officers, Breland is standing between her car and the open driver's side door. *See* Ex. "C" to Def.'s Mot. [18] (video conventionally filed). Officer Dedeaux attempts to move Breland towards the rear of her vehicle and touches her arm or shoulder. *See id.* According

to Officer Dedeaux's Police Report [18-1], he and Officer Parker wanted to move Breland for purposes of officer safety and in order to prevent her from getting back into the car and driving away. Dedeaux's Report [18-1] at 2.

Breland resists and says, "don't do that," at which point Officer Dedeaux pulls her away from the car door. *See* Ex. "C" to Def.'s Mot. [18] (video conventionally filed). Breland then attempts to walk away from the side of the car where Officer Dedeaux had placed her, and Officer Parker grabs her arm and states "ma'am, I ain't gonna tell you again – be still!" *See id.* Officer Parker turns Breland around to face her car and places her hands on the trunk. *See id.*

Approximately seven minutes and twenty seconds into the video, Officer Parker asks Breland if there is someone who can drive her home, and she responds "no." Breland insists that she can drive. *See id.* At approximately nine minutes and seven seconds, one of the officers asks Breland if she can call someone to retrieve her vehicle; Breland states that she does not want to call anyone. *See id.*

Officer Dedeaux ultimately decided to arrest Breland for driving under the influence of alcohol ("DUI") for what he perceived to be her "heavy intoxication." Dedeaux's Report [18-1] at 2. On the video, after Officer Dedeaux reads Breland her *Miranda* rights, she refuses to be handcuffed. *See* Ex. "C" to Def.'s Mot. [18] (video conventionally filed). Officer Dedeaux directs Breland to remove her leather jacket as he grabs her left harm. *See id.* According to Officer Dedeaux, he wanted to search the jacket, but not while Breland was wearing it. *See* Dedeaux's Report [18-1] at 2.

Breland resists and pulls away from Officer Dedeaux, saying "take your hands off my jacket." *See* Ex. "C" to Def.'s Mot. [18] (video conventionally filed). When Officer Parker steps in to assist, *see id.*; Dedeaux's Report [18-1] at 2, Breland screams at the officers and struggles with them, and it appears that she attempts to enter her car, *see* Ex. "C" to Def.'s Mot. [18] (video conventionally filed). Breland yells "don't push me!" and points her finger at Officer Dedeaux, to which Officer Dedeaux responds "I'll push you again if you come near this car." *See id.* Breland then states, "I'll kick the shit out of you then," prompting Officer Dedeaux to respond, "and you'll be charged with assault on a police officer." *See id.*

Breland begins to walk away from the car, down the street, at which point Officer Dedeaux apparently displays a taser. *See id.* Breland turns her back to Officer Dedeaux and places her arm up to shield her face. *See id.* When Officer Parker informs Officer Dedeaux that Breland's jacket is too thick, Officer Dedeaux instead grabs her arm. *See id.* Breland again resists, and Officer Dedeaux "grab[s] her by her right arm and [takes] her to the ground." Dedeaux's Report [18-1] at 2. It appears from the video that Officers Dedeaux and Parker then move Breland onto her stomach and handcuff her hands behind her back. *See* Ex. "C" to Def.'s Mot. [18] (conventionally filed).

One can see from the video that Officer Parker walks a handcuffed Breland to the rear of his patrol car. Officer Parker apparently believes Breland is attempting to spit on Officer Dedeaux and orders her "don't you spit on him." *See* Ex. "C" to Def.'s Mot. [18] (conventionally filed). According to Officer Dedeaux, at that point

Officer Parker grabbed Breland's hair and turned her head away from Dedeaux in order to prevent Breland from spitting on him. Dedeaux's Report [18-1] at 2.

Officer Parker places Breland into the back of his patrol car and closes the door. *See* Ex. "C" to Def.'s Mot. [18] (video conventionally filed). Breland can still be heard screaming from inside the vehicle, including informing the officers that her daughter and son-in-law were police officers, and using expletives to refer to the officers. *See id.* Breland also threatens the officers. *See id.* For example, at approximately 23 minutes into the video, she proclaims that, "if I could get out of these cuffs, I would have whooped ya'll's asses!" *See id.* A few minutes later, Breland threatens to "get a shot gun, shove it up your ass, and blow you a new hole." *See id.*

Several minutes later, an occasional, slow banging or beating sound becomes audible on the video. *See id.* Officer Parker asks Breland what she is kicking or beating on, and she responds that "I'm fixing to beat myself out of this vehicle." *See id.* This video concludes as Officer Parker says something about Breland not hurting herself. *See id.*

2.    Events at the jail

Officer Parker transported Breland to the Stone County Jail. Dedeaux's Report [18-1] at 2. Officer Dedeaux also traveled to the jail in order to conduct an Intoxilyzer 8000 test on Breland. *Id.* According to Officer Dedeaux, he arrived at the jail at approximately 12:17 a.m. to begin the 20-minute observation period prior to administering the test. *Id.*

Officer Dedeaux has supplied approximately 30 minutes of Officer Parker's body-camera video from inside what appears to be a testing or booking room at the jail. *See* Ex. "E" to Def.'s Mot. [18] (filed conventionally). Breland has provided a little over five minutes of surveillance video from the same room, but taken later in time than Officer Parker's body-camera footage. *See* Ex. "A" to Pl.'s Resp. [24] (filed conventionally).

At the outset of Officer Parker's body-camera video, Officer Dedeaux is seated at a desk against a wall working on paperwork, and Breland is seated in a chair. *See* Ex. "E" to Def.'s Mot. [18] (filed conventionally). She is not handcuffed. *See id.* There is a table between Officer Dedeaux's desk and Breland's chair. *See id.* Breland's chairback is situated flush with the cinderblock wall, and its side is against the edge of the table. *See id.*

Throughout the video, Breland remains belligerent and argumentative, and exhibits erratic behavior. At one point, approximately six minutes and 50 seconds into the video, Breland tells one of the jail or correctional officers, "I'm going to knock you out." *See id.* When the officer asks Breland if she is threatening him, she says, "I could do that so quick, you wouldn't even know it." *See id.* The officer instructs Breland to sit and calm down. A short time later, Breland tells the officers that "I'll take all y'all on, anytime." *See id.*

At approximately 17 minutes and 10 seconds into the video, Breland moves to the front of her chair and states that she needs to use the restroom and wants the

cane out of her car.[2]  *See id.*  When officers do not respond to her requests, Breland remains seated on the edge of the chair but lunges her upper body in the direction of the jail officer who is positioned closest to her.  *See id.*  Breland simultaneously waves her arms in an erratic fashion in the direction of the jail officer, who orders Breland to place her hands behind her back; Breland refuses.  *See id.*  The jail officer repeats the request, and Breland says, "hell no," as she quickly climbs to stand on the chair.  *Id.*  Breland repeatedly refuses to comply with the officer's instructions and remains standing on the chair for approximately 40 seconds, continuing to be combative.  *See id.*

When Breland eventually steps down from the chair, the jail officer handcuffs her hands behind her back and instructs her to sit down.  *See id.*  Breland sits, but then abruptly stands, stating that "it hurts."  *See id.*  The jail officer repeatedly tells Breland to sit down, but she refuses and remains standing for over a minute more before finally sitting.  *See id.*

When Officer Parker comments to the jail officer about Breland jumping up on the chair earlier, Breland states, "you don't know what I'm capable of."  *See id.*  Breland warns, "I could swift kick you with one leg across your head, and you'd be like, where's my head at?"  *See id.*  A few minutes later, Officer Parker and the jail officer exit the room, leaving only Officer Dedeaux with Breland.  *See id.*  Breland

---

[2]  Breland was suffering from a preexisting injury to her left foot, which is visible on the videos.  On the body-camera video from the testing or booking room, Breland informs the officers that she cut her foot with a machete while attempting to kill a rattlesnake and that she had been in the intensive care unit ("ICU") of the hospital.

demands that Officer Dedeaux remove her handcuffs, and Officer Dedeaux states that he will. *See id.* It is unclear when Dedeaux does so, as one can only hear their voices off camera. *See id.*

Throughout the entirety of Parker's body-camera video, Officer Dedeaux never leaves the room. *See id.* Just before the conclusion of the video, Breland is heard sternly saying to Officer Dedeaux "look at me!", *see id.*, followed by "get this shit off of me. Tell him to get these cuffs off of me," *see id.* The jail officer standing outside of the room instructs Breland to "calm down," to which she responds "no." *See id.* As this video concludes, Breland is raising her voice and yelling for the officers to call certain individuals. *See id.*

3.    The surveillance video

Breland has submitted a roughly five-minute surveillance video from inside the jail testing or booking room as Exhibit "A" to her Response. *See* Ex. "A" to Pl.'s Resp. [24] (video filed conventionally). While this video obviously begins at some point after Officer Parker's body-camera footage ends, it is not clear how much time elapsed between the two. *See id.* Also, there is no audio on the surveillance video. *See id.*

Based upon the time and date stamp, the video starts at 12:47 a.m. on October 31, 2014. Breland is seen seated in the room, on top of her black jacket, with her hands handcuffed behind her back. About one minute into the video, Breland stands and Officer Dedeaux removes her handcuffs. The black jacket remains on the chair.

According to Officer Dedeaux, when he offered Breland the Intoxilyzer 8000 test after the 20-minute waiting period, she refused it and stood. Dedeaux's Report [18-1] at 2-3. Officer Dedeaux "removed the handcuffs from Breland so that she could take the test," *id.* at 3, and "advised Breland to sit back down and that [he] would let her know when she could stand up," *id.* "Breland refused to comply and instead picked up her leather jacket and started fumbling through the pockets." *Id.* According to Officer Dedeaux's Report, at that point Officer Parker informed him that he had not searched the jacket, prompting Officer Dedeaux to attempt to take the jacket from Breland in order to check the pockets. *Id.*

The video shows that Breland turns towards the chair, grabs her jacket, and rifles through it for around seven or eight seconds. *See* Ex. "A" to Pl.'s Resp. [24] (filed conventionally). Officer Dedeaux approaches Breland and grabs the jacket as well, and the two pull for control of the jacket. *See id.* While Officer Dedeaux is grasping the jacket in his left hand, he uses his right hand to grab Breland's shoulder or back of the neck and direct her down towards the chair, which abutted a table. *See id.* As Officer Dedeaux pushes Breland down, her face apparently hits the edge of the desk or the hard back of the chair, at which point Officer Dedeaux is able to secure the jacket. *See id.*

According to Officer Dedeaux, he pushed down on Breland's left shoulder in an effort to attempt to make her sit. Dedeaux's Report [18-1] at 3. "Instead Breland turned neary [sic] 180 degrees in the opposite direction and hit the corner of the chair and table that was next to the chair with the bridge of her nose.

Breland received an abrasion on the bridge of her nose which started bleeding heavily . . . ." *Id.*

Other officers are seen coming to assist. *See* Ex. "A" to Pl.'s Resp. [24] (filed conventionally). Officer Dedeaux walks to the door and back while searching the jacket. *See id.* When he finishes, Officer Dedeaux hands the jacket to an officer outside of the room. *See id.* Another officer with rubber gloves handcuffs Breland while a second one wearing rubber gloves brings paper towels to apply to her face. *See id.*

Officers called for an ambulance, and Breland was transported to Stone County Hospital. Dedeaux's Report [18-1] at 3. Officer Dedeaux then obtained a search warrant for a sample of Breland's blood. *Id.* Officer Dedeaux's Report indicates that "Breland was extremely belligerent throughout the entire process and threatened all of the officers several times. Breland was so belligerent, resistive, and uncooperative to the hospital staff that they eventually discharged her." *Id.* Officer Parker transported Breland back to the jail where she was booked and charged with careless driving, improper equipment due to her lack of tag lights, resisting arrest, and DUI. *Id.*

4.  Breland's Affidavit [24-3]

Breland has submitted her own Affidavit in which she contends that at the time of her arrest, she was 62 years old, "five foot four (5'3") [sic] in height, weighed approximately one hundred forty-five (145 Lbs.), and was physically disabled." Pl.'s Aff. [24-3] at 2. According to Breland, she "was not combative at the scene of [her]

arrest and [she] did not attempt to flee." *Id.* at 1.

Breland states that while she was waiting for the Intoxilyzer test, she stood up and Officer Dedeaux removed her handcuffs. *Id.* at 2. She then "picked up [her] jacket that [she] had been wearing when arrested and was sitting on and Officer Dedeaux grabbed the jacket and tried to rank [sic] it out of [her] hands." *Id.* Breland asserts that

> [a]lmost at the same time, [Dedeaux] roughly grabbed the back of my neck, and before I could say or do anything, he suddenly shoved me violently, and with great force forward, and slamming me head first into a hard table-top and cinder block wall.
>
> . . . As he shoved me forward, I could still feel his hand tightly on the back of my neck when my head and face impacted the table-top and wall.

*Id.* Breland claims that she suffered injuries to her nose and right eye which require continuing medical care and treatment. *See* Pl.'s Aff. [24-3] at 4. She further avers that all of the charges for which she was arrested have been dismissed. *Id.* at 2.

B.    Procedural background

Breland filed this lawsuit on September 29, 2017, against Defendants Officer Dedeaux and the City of Wiggins, Mississippi.[3] The Complaint asserts claims under 42 U.S.C. § 1983 for Officer Dedeaux's alleged use of excessive force in violation of the Fourth Amendment to the United States Constitution. Compl. [1] at 9, 13-17.[4]

---

[3] Breland also sued Officer Parker, *see* Compl. [1] at 1, but voluntarily dismissed her claims against him on January 11, 2018, *see* Notice [13] at 1.

[4] While it is unclear from the Complaint whether Breland may also be asserting state-law claims against Defendants, she clarifies in her Response [24] that, "she did not include any

According to the Complaint, Officer Dedeaux "slammed Mrs. Breland face/head first into the counter/wall," *id.* at 2, and "never offered any assistance after his unprovoked assault on Mrs. Breland even though it was plainly obvious from her readily apparent injury and bleeding that she needed immediate medical attention," *id.* at 3.[5] Breland's excessive force claim against Officer Dedeaux therefore relates to the incidents in the jail room, and not to the traffic stop.

Officer Dedeaux has filed a Motion [18] for Summary Judgment asserting that he is entitled to qualified immunity. In support of his Motion [18], Officer Dedeaux has supplied his own Affidavit [21].[6] Breland has filed a Motion [32] to Strike this Affidavit [21].

## II. DISCUSSION

A. Breland's Motion [32] to Strike

Breland asks the Court to strike Officer Dedeaux's Affidavit [21] submitted in

---

state law claims pursuant to the Mississippi Tort Claims Act." Pl.'s Resp. [24] at 2. "Plaintiff has not asserted any state law claims . . . ." *Id.* at 3.

[5] In the Complaint, Breland does not advance a claim of deliberate indifference to her medical needs under the Fourteenth Amendment. Breland's stray reference to Officer Dedeaux's failure to assist is insufficient to plead a such a claim. While Breland cites the Fourteenth Amendment in the Complaint, she does so in reference to her excessive force claim. *See* Compl. [1] at 6, 7, 9, 13. Moreover, even if the Complaint [1] were found to state such a claim, Officer Dedeaux would be entitled to qualified immunity. *See* Def.'s Mem. [19] at 16 (arguing qualified immunity as to any claim that Officer Dedeaux displayed "deliberate indifference" to a serious medical need under the Fourteenth Amendment). The surveillance video clearly shows that officers who were wearing rubber gloves immediately came to Breland's assistance. *See* Ex. "A" to Pl.'s Resp. [24] (video filed conventionally). Officer Dedeaux has also presented evidence that Breland was then transported to a hospital, though Breland remained uncooperative and apparently refused treatment. *See* Dedeaux's Report [18-1] at 3.

[6] Officer Dedeaux originally attached a copy of the Affidavit [18-4] as Exhibit "D" to his Motion [18], but the copy supplied was missing page 3. Dedeaux subsequently filed, as a separate docket entry [21], a complete copy of the Affidavit.

support of his Motion [18] for Summary Judgment, arguing that it "contains improper assertions and allegation [sic] which constitute conclusory allegation, [sic] hearsay, legal arguments and/or unsubstantiated facts . . . ." *See* Pl.'s Mem. [33] at 1. Breland contends that many of the assertions in Officer Dedeaux's Affidavit are "contrary to the videos in evidence and/or misrepresent the context of events which are more fully apparent from a review of the videos." *Id.* at 2. Officer Dedeaux opposes Breland's Motion [32], arguing that it is untimely, that she sought no discovery, and that the Affidavit is based upon Officer Dedeaux's personal knowledge. *See* Def.'s Resp. [35] at 5. Officer Dedeaux maintains that the videos in evidence corroborate what is contained in the Affidavit.

Out of an abundance of caution, the Court has not relied upon Officer Dedeaux's Affidavit [21] in resolving his Motion [18] for Summary Judgment. Even if it had, the result would not change. Breland's Motion [32] to Strike the Affidavit is thus moot.

B.    Officer Dedeaux's Motion [18] for Summary Judgment

1.    Summary judgment standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant carries this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

14

To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there exists a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). "A genuine dispute of material fact means that evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC&R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quotation omitted). If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In deciding whether summary judgment is appropriate, the Court views facts and inferences in the light most favorable to the nonmoving party. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 858 (5th Cir. 2010).

However, at summary judgment, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). According to the United States Supreme Court, where a party's version of events is so "utterly discredited by the record that no reasonable jury could have believed him," or amounts to a "visible fiction," a court should not rely upon it. *Id.* at 380-81. Instead, a court should view the facts "in the light depicted by the videotape." *Id.* at 381.

2.    Qualified immunity

In this case, Officer Dedeaux asserts that he is entitled to qualified immunity.

> A qualified immunity defense alters the usual summary judgment burden of proof.  Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law.  The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor.

*Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citations omitted).

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" at the time the conduct occurred.  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quotations omitted).  "The qualified immunity defense has two prongs: whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation."  *Brown*, 623 F.3d at 253.

While Supreme Court precedent "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."  *Kisela*, 138 S. Ct. at 1152 (quotation omitted).  "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law."  *Id.* (quotation omitted).

Even if a defendant's actions violated a clearly established right, a court must ask whether qualified immunity is still appropriate because the defendant's actions

were "objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Brown*, 623 F.3d at 253 (quotation omitted). "Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury." *Id.* "An official's actions must be judged in light of the circumstances that confronted him, without the benefit of hindsight." *Id.*

3.     Excessive force claims

In order to prevail on a claim for excessive force, a plaintiff must show "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (quotation omitted). The question presented is one of "'objective reasonableness,' not subjective intent, and an officer's conduct must be judged in light of the circumstances confronting him, without the benefit of hindsight." *Id.*

> With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham v. Connor*, 490 U.S. 386, 396–97 (1989) (quotation omitted).

This "reasonableness" inquiry is an objective one, based upon the facts and circumstances confronting the officer at the time, without regard to underlying intent or motivation. *Id.* at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an

officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

The Supreme Court has stated that the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, but "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Because the question of whether excessive force was used is an area of the law "in which the result depends very much on the facts of each case," the Supreme Court has held that "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (quotation omitted). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

4.    Analysis

Because Breland is the nonmoving party, the Court must view the facts and inferences in the light most favorable to her. However, the Court need not credit assertions contained in her Affidavit [24-3] that are utterly discredited by the videos of record. *See Scott*, 550 U.S. at 380-81.

Breland claims that when she picked up her jacket, Officer Dedeaux tried to

18

"rank [sic] it out of [her] hands." Pl.'s Aff. [24-3] at 2. "Almost at the same time" he

"roughly grabbed" the back of her neck and shoved her violently, with great force

forward, and slammed her head-first into a hard table top and cinderblock wall. *Id.*

The jail surveillance video Breland has provided clearly demonstrates that for

several seconds she was digging in her jacket pockets and then actively resisted

Officer Dedeaux's attempts to gain control of the jacket and search it before Officer

Dedeaux then used an arm bar to push Breland down into the chair.[7]

Officer Dedeaux's police report indicates that he was trying to retrieve the

jacket from Breland because, as she rifled through it, Officer Parker informed him

that he had not searched it. *See* Report [18-1] at 3. Likewise, Officer Parker's

report states that when he noticed Breland "digging in her jacket," he informed

---

[7] In opposition to Officer Dedeaux's Motion for Summary Judgment, Breland has supplied
the Affidavit [24-2] of Captain Ray Boggs ("Captain Boggs") of the Stone County,
Mississippi, Sheriff's Department. Captain Boggs states that he personally conducted an
official investigation involving this incident and reviewed the surveillance video. Boggs'
Aff. [24-2] at 1-2. Captain Boggs states that in reviewing the surveillance video, he "did not
see any actions by Mrs. Breland that were a threat or danger to Officer Dedeaux, other
Officers, herself, or anyone else," "did not see Mrs. Breland fighting and/or being
combative," and "did not see Mrs. Breland resisting arrest or attempting to flee." *Id.* at 2-3.
Breland has not adequately explained why the Court should accord weight to Captain
Boggs' conclusory statements regarding a video that is itself before the Court for review.
Captain Boggs testified as to what he saw on the surveillance video, but he did not opine as
to what Officer Dedeaux or a reasonable officer in the same situation as Officer Dedeaux
would have perceived while actually interacting with Breland in the jail on the night in
question, without the benefit of hindsight, which is the relevant inquiry for purposes of
qualified-immunity. Moreover, the version of the surveillance video Breland supplied to the
Court did not contain audio, which is presumably the same version reviewed by Captain
Boggs. It is not apparent from Captain Boggs' Affidavit that he had the benefit of
reviewing any of the other evidence in this case, such as the body-camera video that showed
Breland's earlier erratic and threatening behavior, or Officers Dedeaux's and Parker's
reports which reflect that when Breland began reaching into her jacket, Officer Parker
informed Officer Dedeaux that he had not searched it. The Court has before it on summary
judgment much more evidence than the silent surveillance video Captain Boggs reviewed.

Officer Dedeaux that he had not yet searched the jacket. Report [18-2] at 1. Breland has not supplied any competent summary judgment evidence to rebut these statements. According to Officer Dedeaux, he "pushed down on [Breland's] left shoulder in an attempt to make her sit back down." Report [18-1] at 3.

Breland identifies what she refers to as a "similar 'face slamming case'" decided by the Fifth Circuit. *See* Pl.'s Mem. [25] at 9 (citing *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008)). *Bush* is distinguishable. In that case, the plaintiff admitted that she pulled away from the police officer when he attempted to arrest her. *Bush*, 513 F.3d at 496. The plaintiff stopped resisting after the police officer grabbed her right hand, but after both hands were cuffed, the officer "placed his hand behind her neck and head and forced her face into the rear window of a nearby vehicle, injuring her jaw and breaking two of her teeth." *Id.*

In considering the defendant officer's assertion of qualified immunity, the Fifth Circuit held that the plaintiff had shown that she sustained significant injuries when the defendant "forcefully slammed" the plaintiff's face into a vehicle while she was handcuffed and subdued. *Id.* at 501. Because, under the plaintiff's version of events, she was not resisting arrest or attempting to flee at the time, the defendant should have known that he could not forcefully slam the plaintiff's face into a vehicle while she was restrained and subdued. *Id.* at 502. In the present case, it cannot be disputed that Breland was not restrained, and she was far from subdued. In fact, she was actively struggling with Officer Dedeaux for control of the jacket after another officer had informed Dedeaux that the jacket had not been

searched. To a reasonable, objective observer, Breland's actions could have posed a

threat to the officer's and others' safety. *Bush* is therefore factually distinguishable.

In her Surrebuttal [36], Breland cites *Hanks v. Rogers*, 853 F.3d 738 (5th Cir.

2017),[8] which is also factually distinguishable. In that case, the plaintiff was

standing with his back to the defendant officer, with his "empty hands . . .

surrendered behind his back" and in view of the officer. *Hanks*, 853 F.3d at 742-43.

The plaintiff took a small lateral step, and the officer almost simultaneously rushed

the plaintiff and administered a blow to his upper back or neck. *Id.* at 743. The

blow forced the plaintiff's upper body onto the trunk of his vehicle, and the officer

maintained contact with the plaintiff as he moved him onto the ground. *Id.* Here,

Breland was not standing with empty hands surrendered at the time Officer

Dedeaux employed force, and the type of force Officer Dedeaux did apply was

significantly different.

Based upon the undisputed facts in the record, the Court concludes that

Breland has not carried her burden of showing that Officer Dedeaux acted

unreasonably under the circumstances facing him. Breland has not shown that her

injury "resulted directly and only from the use of force that was clearly excessive, . .

. the excessiveness of which was clearly unreasonable." *Manis*, 585 F.3d at 843. At

the time Officer Dedeaux used the arm bar to push Breland towards the chair, she

was digging through the pockets of her jacket, which had not been searched, and

---

[8] Breland refers to the case as "*Hanks v. Randall*, No. 15-11295 (5th Cir. 2017)." This
appears to be a typographical error in one party's name, as Randall was Rogers' first name.

she was actively resisting Officer Dedeaux's efforts to confiscate and search the jacket. Because the jacket had not been searched, and given the prior events of that evening, a reasonable officer could have believed that the jacket might contain some type of weapon or other contraband. Further, based upon Breland's inebriated state, her belligerent and erratic behavior, and her previous verbal and physical threats to the officers, as well as her refusal to release the jacket when commanded, Officer Dedeaux had objectively reasonable grounds to believe that Breland posed an immediate threat to his and the other officers' safety. The legal authority cited by Breland does not "clearly establish" that Officer Dedeaux violated the Fourth Amendment under the facts presented here, and his conduct was objectively reasonable under the circumstances. Officer Dedeaux is entitled to qualified immunity on Breland's excessive force claim.

## III. CONCLUSION

To the extent the Court has not addressed any of the parties' arguments, it has considered them and determined that they would not alter the result. Officer Dedeaux's Motion [18] for Summary Judgment should be granted, and Breland's claims against Officer Dedeaux in his individual capacity should be dismissed with prejudice on grounds of qualified immunity. Breland's Motion [32] to Strike is moot.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, the Motion [18] for Summary Judgment filed by Defendant Adam Dedeaux is **GRANTED**, and Plaintiff Susan Elaine Breland's claims against Defendant Adam Dedeaux in his individual capacity are **DISMISSED WITH PREJUDICE**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiff Susan

Elaine Breland's Motion [32] to Strike is **MOOT**.

**SO ORDERED AND ADJUDGED**, this the 20th day of March, 2019.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE